# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Christian Darby )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Nancy A. Berryhill, Acting )<br>Commissioner of Social Security,[1] )<br>)<br>Defendant. ) | No. 16 CV 50336<br>Magistrate Judge Iain D. Johnston |

## **MEMORANDUM OPINION AND ORDER**

The administrative law judge ("ALJ") found that plaintiff Christian Darby became disabled, as a result of his epilepsy and dementia, on April 13, 2015. Not surprisingly, plaintiff does not argue with the determination that he was disabled, but does object to the onset date chosen by the ALJ. Plaintiff believes it should have been earlier, on December 19, 2013. This appeal concerns this 16-month difference. Everyone agrees that plaintiff's condition (in particular his cognitive abilities) worsened dramatically from 2009 until 2016. In 2009, plaintiff was working as an engineer and was cognitively rated "way above average," but in early 2016, he was found to be "severely cognitively impaired" with troubling memory lapses and odd behavioral episodes. R. 44. The more difficult question is determining exactly when plaintiff crossed the threshold for being found disabled under the applicable Social Security tests.

## BACKGROUND

Although plaintiff experienced epileptic seizures since age ten, he was able to work as a civil engineer for many years despite them. Later in his career, the seizures became more problematic. In 2004 and then again in 2008, he underwent brain surgery to try and address the

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

problem. After each surgery, the seizures stopped for about a year, but then returned to pre-surgery levels. R. 389. Since 2007, plaintiff has been treated by Dr. Stephan U. Schuele who is Chief of Neurophysiology and Epilepsy at the Northwestern Feinberg School of Medicine.

Two medical visits with Dr. Schuele figure prominently in the ALJ's analysis. The first was in June 2013. Plaintiff then reported to Dr. Schuele that his seizures had "started to pick up" with him having a seizure "every other month, often in clusters." R. 315. But aside from this fact, plaintiff did not seem to report any new or unusual problems. Plaintiff next saw Dr. Schuele in December 2015—two and a half years later.

At this second visit, plaintiff reported that he "continued" to have seizures about twice a month, mostly in the evening or while sleeping. R. 377. He did not otherwise report any major problems. However, plaintiff's wife, who was apparently not at the 2013 visit, painted a more ominous picture. She told Dr. Schuele that half of the days plaintiff was "very confused," and engaged in unusual behaviors. *Id.* For example, she sometimes found him "wandering around in the back yard in pajamas looking for [a] bathroom." *Id.* She stated that he "routinely falls out of bed, gets black eyes, and gets some bruises on [his] head." *Id.* She suspected that he was "having small seizures more frequently than we know." *Id.* In his examination of plaintiff, Dr. Schuele observed that he had difficulties "grasp[ing] the content and goal of the conversation." R. 379. Based on all this evidence, Dr. Schuele ordered neurocognitive testing, as well as EEG monitoring. He suspected that plaintiff had "a progressive memory decline which may or may not be related to unrecognized nocturnal seizures." R. 380. The tests were conducted in January 2016, and they confirmed that plaintiff, indeed, had suffered a "striking" cognitive decline since 2009 and that he had a major neurocognitive disorder. R. 395, 657. Doctors recommended that plaintiff's wife be appointed as his power of attorney.

2

Two months later, a hearing was held. The main witness—and the only medical expert who has provided any substantive analysis in this case—was Dr. Schuele. The mere fact that he took the time to testify, which he did at his own expense, is unusual in disability cases. His willingness to testify seems related to seeing plaintiff's decline, which he described as follows:

> I've rarely seen a patient who has [] had such a bad course over the last couple of years as Christian Darby who was in 2010 a highly intelligent person who underwent surgery and did better for a short period of time and basically is incompetent now. I think that has been very dramatic for me to experience.

R. 47.

The ALJ first asked questions of Dr. Schuele. (As discussed below, plaintiff believes this questioning was overly adversarial.) The ALJ's first questions were about the two-and-a-half-year treatment gap. After some back and forth, Dr. Schuele agreed that there were no in-person visits between June 2013 and December 2015, but he denied that this should be characterized as a treatment gap because plaintiff or his wife had a dozen or so phone consultations with the clinic during this interval.

The rest of the ALJ's questions focused on the monthly frequency of plaintiff's seizures at various points in time. This was the key issue at the hearing, and remains the key issue in the parties' briefs. Although not explicitly acknowledged by the ALJ at the time she questioned Dr. Schuele, her inquiry clearly related to Listing 11.02, which (in the version then in effect) required that the claimant have seizures "more frequently than once a month."

The ALJ first asked about the seizure frequency in December 2015. Dr. Schuele noted that "it was difficult to say how many seizures [plaintiff] had" because plaintiff was underreporting them (due to his memory decline) and because his wife was unable to observe all of them (she slept in a different room). R. 37. However, based on plaintiff's "significant memory decline and behavioral changes which [have] been going on for a while," and based on the EEG

3

testing done in January 2016, which showed that plaintiff had two sub-clinical seizures in a five-day period even though he was on full medication, Dr. Schuele estimated that plaintiff was averaging about twelve seizures a month in December 2015. R. 38.

The ALJ then asked about the frequency from 2013 to 2015. Dr. Schuele again noted that plaintiff was "always downplaying the severity of his condition."[2] R. 38. Dr. Schuele then estimated that plaintiff was having "probably half a dozen or more [seizures] during that period on a monthly basis." R. 40. This "period" was, based on the ALJ's earlier question, from 2013 to 2015.

The ALJ then asked him what evidence supported this answer. The following colloquy ensued, which is quoted because it is one of the exchanges that plaintiff believes shows that the ALJ was too adversarial:

> Q  And on what do you rely in the evidence in the record to say that?
>
> A  Our video EEG recording and that his medication hadn't changed over these years and that—
>
> Q  When was it—
>
> A  —we found five—that we found two seizures in a five-day period and the fact that he had fluctuation[s] in memory which are best explained by having [INAUDIBLE] seizures at night.
>
> Q  Okay. And that's all as of—that testing was all as of January 2016?
>
> A  Yeah, I think we—you know—yes, because, as I said—
>
> Q  Okay. Thank you.
>
> A  He didn't follow up.
>
> Q  Thank you. Now, let me ask you another question, sir.
>
> A. Sure. Yes, I realized the severity of—in December or January 201[6].

---

[2] He also noted that "many [epilepsy] patients [] don't recognize all of their seizures." R. 39-40.

4

> Q  Well, Dr. Schuele? Dr. Schuele?  Let me just tell you, you're not helping me understand the case by not answering my questions?
>
> A.  Okay.
>
> Q.  I'm trying to understand—
>
> A  To answer your question, I realized the severity of the condition in January 2016.  Is that answering your question?
>
> Q  Yes it does.
>
> A  Thank you.
>
> Q  But I know there's things you want to say but it doesn't help me understand the case if you do not answer my question.
>
> A  Sure.
>
> Q  So please try to listen to the question and answer the question so that I can understand the case better.
>
> A  Okay.

R. 40-41. This line of questioning eventually hit a dead-end. The ALJ then asked one question about whether there were any daytime seizures, and Dr. Schuele stated that the seizures were typically at night but that there were "recorded and monitored daytime seizures" when, for example, plaintiff came home after suffering a seizure at work. R. 43. The ALJ's final question was whether Dr. Schuele knew why plaintiff stopped working in 2013. He did not know.

Plaintiff's attorney then questioned Dr. Schuele.  Counsel's questions elicited similar answers, but there were a few additional points. Counsel asked whether plaintiff tended to have a flurry of seizures in a cluster. Dr. Schuele agreed with this assertion.  Counsel then asked about plaintiff's condition the next day after the nighttime seizures. Dr. Schuele answered by indicating that there were "two things [] going on in parallel," one being the seizures and the other the dementia. R. 44. This led to a discussion of causation and the possible interrelationship between

the two conditions. Although Dr. Schuele stated that it was "hard to say what triggered" plaintiff's memory decline, which plaintiff's wife believed had being going on for two to three years, Dr. Schuele stated that "best explanation" for the bad memory days was that plaintiff had seizures the previous night, which were "unrecognized" seizures that he "probably didn't even remember." R. 44-45. Dr. Schuele also briefly mentioned that plaintiff "has a frontal lobe syndrome from the surgeries," which was "probably not related to his epilepsy." R. 45. This condition perhaps caused plaintiff to have "a little bit of megalomania, meaning overestimating his actual abilities." *Id.* Dr. Schuele noted that plaintiff had an "unrealistic" vision of being able to go back to work and being independent. Dr. Schuele stated that the seizures plaintiff's wife observed were probably only the tip of the iceberg. Plaintiff's counsel then asked Dr. Schuele how far back he could reasonably project that plaintiff was mentally incompetent. Dr. Schuele did not give a precise answer, but stated that he would "probably go by [plaintiff's] wife's description" that it was in the "last two to three years." R. 46. Dr. Schuele then stated that he still believed that the dementia was related to the numerous small seizures, although he stated that the dementia was possibly due to the severity of a smaller number of seizures. Dr. Schuele did not believe the memory decline was caused by plaintiff's multiple seizure medications.

The ALJ then asked a second set of questions. She focused on the reference to the possible effect of a single severe seizure. Analogizing to NFL concussions, Dr. Schuele stated that either frequency or severity could cause problems. R. 48 ("if you have more convulsions, that takes less seizures to impair you [than] if you have more smaller seizures"). The ALJ then asked him to concede that he "can't determine [] whether it was severity or frequency." R. 49. Dr. Schuele agreed, but noted that plaintiff "had many, many traumatic seizures over his life so it's hard for [him] to say." *Id.*

6

On July 8, 2016, the ALJ issued her decision, finding plaintiff disabled as of April 13, 2015. However, before that date, the ALJ concluded that plaintiff had the residual functional capacity ("RFC") to do the full range of exertional work. The April 13, 2015 date was a rough mid-point between the onset date alleged by plaintiff (December 19, 2013) and the date everyone agreed that plaintiff was severely impaired (December 2015). The significance of this date was that plaintiff that month went to the emergency room to treat a head wound suffered while falling during a seizure and hitting his head on an iron table leg. R. 419. A key piece of evidence relied on by the ALJ was a seizure diary that plaintiff's wife kept.[3] Ex. 16F. The diary covered the period from December 2013 until March 2016, and listed the dates and times of plaintiff's seizures and occasionally included additional information about associated problems such as dizziness. According to the ALJ, this diary showed that, after April 2015, plaintiff began experiencing more daytime seizures. The ALJ relied on this fact, along with the fact that plaintiff did not seek treatment during this period. Earlier in the decision, the ALJ gave the following explanation for why plaintiff did not satisfy listing 11.02:

> The claimant's severe impairments did not meet the criteria of any listed impairment. In reaching this conclusion, I considered all of the listings found in 20 CFR Part 404, Subpart P, Appendix 1, paying particular attention to listings 11.02 (epilepsy -- convulsive epilepsy) and 11.03 (epilepsy -- non-convulsive epilepsy). The medical evidence did not document listing-level severity, and no acceptable medical source documented findings equivalent in severity to the criteria of any listed impairment, individually or in combination.
>
> Notably, the state Agency reviewing consultants, who are familiar with disability regulations, reviewed the medical evidence and concluded that claimant's impairments did not meet or equal any listing. Further, claimant's treating neurologist, Dr. Schuele, testified that he believed claimant underreported the frequency of his seizure activity, but acknowledged that according to the medical file he was not aware that claimant might be having more than two seizures a month until December 2015. Although claimant's wife has insisted that claimant has had more than two seizures a month since October 2014 and, after the hearing,

---

[3] The ALJ was not able to question plaintiff's wife about this diary at the hearing because the ALJ did not have the document, perhaps because it was only submitted a few days before.

7

provided a seizure diary that identifies multiple seizures a month (16F), her testimony and post-hearing submission are not enough to overcome the listing requirements for medical documentation. Further, as discussed in more detail below, with regard to listing 11.02, the seizure diary does not support daytime episodes with loss of consciousness/convulsive seizures or nocturnal episodes with daytime residual effects until after the established onset date of April 13, 2015.

R. 15.

## DISCUSSION

Plaintiff raises two primary arguments for remand. First, the ALJ's listing analysis (as quoted above) was incomplete. Second, ALJ disregarded critical parts of Dr. Schuele's testimony. The Court agrees that a remand is warranted based on these arguments.

According to the parties, the version of listing 11.02 in effect at the time of the decision (it was subsequently amended) provided as follows:

> ***11.02 Epilepsy—convulsive epilepsy*** *(grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment.* With:
>
> A. Daytime episodes (loss of consciousness and convulsive seizures); or
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

*See* SSA POMS: DI 34131.013; Dkt. #10 at 4.

The Court finds that the ALJ's listing analysis was insufficient for several reasons. First, it is cursory without a clear explanation. *See Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (two-sentence "perfunctory" listing analysis was inadequate). The ALJ did not quote the listing requirements, nor apply them individually or systematically, leaving this Court in doubt about the ALJ's precise reasoning. To cite one example, the listing refers to seizures occurring "more frequently than *once* a month," but the ALJ's analysis never clearly identifies the number of seizures that the ALJ concluded plaintiff was experiencing at various points in time and even

8

refers at one point to "more than *two* seizures a month." R. 15 (emphasis added). The latter statement raises a question as to whether the ALJ was mistaken about how many seizures a month were required. In short, because this listing analysis is vague, this Court cannot trace the path of the ALJ's reasoning. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

Second, despite statements to the contrary, the ALJ's analysis is not supported by any medical expert testimony. The ALJ claimed that the state agency physicians supported her analysis. *See* R. 15 ("*notably*, the state Agency reviewing consultants [] reviewed the medical evidence and concluded that claimant's impairments did not meet or equal any listing") (emphasis added); Exs. 1A, 2A, 5A, 6A. But a review of the Agency opinions shows that they served merely as a fig leaf. These opinions were rendered in the fall of 2014 and the spring of 2015—well before the key evidence was uncovered about the severity of plaintiff's condition. Moreover, these opinions contain *no* analysis of why the listings were supposedly met. *See, e.g.* R. 86. In fact, these doctors opined that plaintiff could continue working full-time as a civil engineer. In sum, the ALJ cannot credibly claim to have relied on these opinions, much less believe that they were notable. Moreover, as discussed below, Dr. Schuele's testimony also did not support the ALJ's conclusions.

Third, plaintiff validly complains that the ALJ did not provide any equivalency analysis. There is only a conclusory reference to the issue having been considered. The State agency doctors provided no equivalency analysis. *See Barnett*, 381 F.3d at 670 ("the ALJ never consulted a medical expert regarding whether the listing was equaled"). Therefore, this Court has no way of determining how the ALJ reasoned through this issue. This issue should be addressed more explicitly on remand.

Fourth, the most significant problem with the ALJ's decision—both in the listing and RFC analyses—is that the ALJ gave the impression that Dr. Schuele agreed with the ALJ's opinions or that, at a minimum, he did not offer any contrary testimony. The ALJ stated several times in the decision that she was giving "great weight" to Dr. Schuele's opinions. But the ALJ's decision is clearly at odds with the doctor's testimony in several ways. The ALJ was able to give the impression that her views were supported by Dr. Schuele only by purging large chunks of his testimony and by confusingly summarizing a key part of his testimony.

In the decision, the ALJ ambiguously focused on when Dr. Schuele became *aware* that plaintiff's seizures had increased. In the listing analysis, the ALJ summarized the doctor's testimony this way: "claimant's treating neurologist, Dr. Schuele, testified that he believed claimant underreported the frequency of his seizure activity, but acknowledged that according to the medical file he was not aware that claimant might be having more than two seizures a month until December 2015." R. 15. It is true, as this sentence states, that Dr. Schuele only became aware of plaintiff's severe deterioration in December 2015. However, the ALJ left out the doctor's further explanation, discussed multiple times at the hearing, that he was able to extrapolate from the December 2015 evidence and render an opinion about plaintiff's earlier seizure rate. Specifically, he opined that plaintiff likely had six seizures a month during the 2013-15 period. The ALJ simply ignored this testimony. This was a major omission.

There were several other points from Dr. Schuele's testimony that were downplayed or obscured by the ALJ. One was the assertion that plaintiff and his wife consistently underreported the number of seizures. The ALJ only briefly referred to this testimony, but gave it no serious consideration. In fact, in several places, the ALJ accepted plaintiff's self-reports at face value. For example, the ALJ stated that plaintiff did "not recall having any other seizures while at

work" after 2011, accepting this proposition without any consideration that plaintiff's memory had possibly declined. R. 17. The ALJ likewise accepted a 2014 statement by plaintiff's wife that plaintiff's seizures "were nothing out of the ordinary." R. 16. The ALJ, who is not a doctor, relied heavily on this one vague statement from plaintiff's wife, who is also not a doctor, to conclude, in effect, that plaintiff's seizures were minor. But Dr. Schuele never suggested that an "ordinary" seizure (however that term is defined) meant that it could not cause harm. The overarching premise of Dr. Schuele's testimony was that these small unrecognized seizures cumulatively caused enormous damage.

Another overlooked aspect of Dr. Schuele's testimony related to the alleged treatment gap. Dr. Schuele testified about multiple reasons why plaintiff was not seen in person for two and a half years. These included lack of insurance, financial problems, lack of self-awareness and ability to follow through in making an appointment, the ability to do phone consultations as an alternative, and the long drive from Rockford to downtown Chicago. The ALJ gave no serious consideration to these explanations when faulting plaintiff for not scheduling an appointment. *See* R. 18 ("claimant delayed scheduling an appointment until December 2015").[4] On remand, the ALJ should consider these mitigating explanations more carefully before drawing any adverse inferences. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin").

The bottom line is that the ALJ, in fact, gave very little weight to Dr. Schuele's testimony while claiming to have given it great weight. This allowed the ALJ to obscure the fact that she

---

[4] *See also* R. 19 ("the evidence suggests that claimant's condition is sufficiently managed that he does not seek treatment from his neurologist for a worsening of his condition. If behavioral or cognitive issues were of significant concern prior to April 2015, they were not reported to the neurologist, his staff or any other medical professional, other than some memory concerns.").

11

was engaged in a layperson analysis in which she rejected the opinion of a treating physician, one who had a long-term relationship with plaintiff and whose specialty directly related to the primary ailment in issue.

Even if the Court were to overlook the lack of supporting medical testimony, the ALJ's theory for choosing the April 13, 2015 onset date—namely, that it was a significant downward turning point—was neither clearly explained nor reconciled with competing evidence. For one thing, the ALJ relied heavily on plaintiff's wife's diary to argue that plaintiff "begins to have more daytime seizure activity" after April 13, 2015.[5] R. 19. However, in the listing analysis itself, the ALJ seemed to question the reliability of this diary. Moreover, the ALJ's theory that there was an uptick in daytime seizures beginning in April 2015 was not confirmed by Dr. Schuele or plaintiff or his wife, none of whom testified that the time of day of the seizures changed from being mostly at nighttime to occurring in the day. Although the ALJ did not say so explicitly, it is possible that she believed that the head injury in April 2015 was the type of single traumatic injury that, by itself, could trigger an abrupt change. At the hearing, Dr. Schuele briefly discussed this *general* idea, but did not specifically discuss the April 2015 incident. In sum, the ALJ's theory, though not unreasonable in the abstract, is undeveloped and speculative based on the current record.

Having concluded that a remand is appropriate, the Court will only briefly comment on the plaintiff's complaint about the ALJ's questioning. Plaintiff claims that ALJ "demonstrated an intent to ignore anything that Dr. Schuele stated that did not conform to her own observations." Dkt. #9 at 6. In her reply brief, plaintiff adds that "it is truly unfortunate that the audio recording of the hearing is not available," suggesting that the ALJ's tone was worse than what is conveyed

---

[5] This statement seems to be geared toward the daytime seizure prong in Listing 11.02, although the ALJ did not make this point clear.

12

by the transcript. Dkt. #11 at 3. The Court has quoted above a representative sample of the allegedly adversarial questioning; so the reader may make an independent judgment. After reading the entire transcript, the Court agrees that the ALJ's questioning gives the impression at least that she was acting more as a cross-examiner seeking to discredit Dr. Schuele and was less concerned about developing the record in a neutral manner. This conclusion is also supported by the ALJ's later decision to excise key portions of the doctor's testimony from the written decision. The Court notes finally that Dr. Schuele, when being questioned by plaintiff's counsel later in the hearing, stated the following: "sorry for being a little bit flabbergasted by some of the earlier questions." R. 47. This comment suggests that he too found the ALJ's questioning to be confrontational. At the same time, this Court is mindful of the dangers of trying to determine intent from a paper record and also recognizes that the ALJ has to balance multiple concerns in expeditiously conducting a large number of hearings.

In sum, on remand, the ALJ should consider all the above issues (and any other relevant issues not addressed herein) with a fresh eye and should seek the aid of a medical expert to address the difficult line-drawing issue presented by this case. One could argue that Dr. Schuele's testimony—that there were six seizures a month going back to 2013—shows that plaintiff met the listing at an earlier date than the one chosen by the ALJ. But there are other requirements in Listing 11.02 that were not clearly addressed by the doctor, including questions about daytime seizures and whether nighttime seizures caused residual effects. Also, in their briefs, the parties raise questions about whether seizure clusters should be counted as one and whether the monthly seizure rate can be averaged over a longer period such as 12 months. At this point, the parties have not identified any case law or other authority to answer these questions, other than a few brief arguments based on changes in the revised Listing 11.02, which was not

applicable to this case. For these reasons, the Court will not attempt to further parse these issues based on the incomplete record, leaving them for the ALJ and counsel to explore on remand. One additional point—the ALJ's decision at times conflates the listing analysis, which is more discretely focused on the number of seizures per month, with the broader RFC analysis, which requires an assessment of both the seizures and the dementia and their effect on various functional abilities. The ALJ should consider these issues separately, and also should make separate determinations about the effects of the dementia and epilepsy (including any side effects from medication) given that it is still possible that these two conditions are unrelated.

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: November 30, 2017           By: _____
                                      Iain D. Johnston
                                      United States Magistrate Judge